# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

ANDRES ACEVEZ,                    )
        Plaintiff,        )
                          )
    v.                         )      CAUSE NO.: 2:13-CV-168-PRC
                          )
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
        Defendant.        )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Andres Acevez on May 21, 2013, and a Memorandum in Support of Plaintiff's Motion for Summary Judgment or Remand [DE 19], filed by Plaintiff on September 25, 2013. Plaintiff requests that the decision of the Administrative Law Judge denying his claim for supplemental security income be reversed or remanded for further proceedings. On December 27, 2013, the Commissioner filed a response, and Plaintiff filed a reply on January 18, 2014. For the following reasons, the Court denies Plaintiff's request for remand and affirms the ALJ's decision.

## PROCEDURAL BACKGROUND

On April 20, 2010, Plaintiff filed an application for supplemental security income, alleging an onset date of April 16, 2010. The application was initially denied on July 16, 2010, and denied upon reconsideration on September 22, 2010. Plaintiff timely requested a hearing, which was held on July 13, 2011, before Administrative Law Judge (ALJ) Mario G. Silva. In appearance were Plaintiff, non-attorney representative Stephen Weinstein, Plaintiff's mother Theresa Acevez, and vocational expert Thomas Grzesik. The ALJ held a supplementary hearing on December 7, 2011. In appearance were Plaintiff, Stephen Weinstein, Theresa Acevez, vocational expert Clifford Brady,

and medical expert James Brooks, Ph.D. The ALJ issued a written decision denying benefits on December 22, 2011, making the following findings:

1. The claimant has not engaged in substantial gainful activity since April 20, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: depression, bilateral shoulder degenerative joint disease, insulin dependent diabetes, obesity, and drug and alcohol abuse in remission (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 30 pounds occasionally from the floor level, table height, or waist level and can occasionally lift overhead 20 pounds bilaterally. He would be able to frequently lift and carry 10 pounds in all directions. The claimant is able to sit, stand, and walk for 8 hours per day with normal breaks. He must never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant is limited to occasional overhead reaching. There are no limitations with regard to pushing or pulling, reaching forward or to the side, or handling or fingering. He is to avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts, or gases, to extreme cold, and to poorly ventilated areas. He must avoid all exposure to dangerous moving machinery and unprotected heights. He is limited to occupations that do not require near acuity. The claimant is able to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. He is able to interact appropriately with supervisors and coworkers in a routine work setting, and is able to respond to usual work situations and to changes in a routine work setting.

5. The claimant is capable of performing past relevant work as a fast food worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.      The claimant has not been under a disability, as defined in the Social Security Act, since April 20, 2010, the date the application was filed (20 CFR 416.920(g)).

(AR 26-36).

On March 14, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. On May 21, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Commissioner's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Plaintiff was born in 1981 and was twenty-eight years old on the alleged onset date. Plaintiff completed the 11th grade and previously worked as a fast food worker. Plaintiff has not been gainfully employed since April 20, 2010, the application date.

### B. Medical Background

*1.      Treatment History*

On April 13, 2010, Plaintiff presented at the emergency room with nausea, vomiting, and possible hallucinations. The primary diagnosis included vomiting, diarrhea, gastroenteritis, a head contusion, and leukocytosis. In addition, the record noted a known, secondary diagnosis of diabetes mellitus. A triage note indicated that Plaintiff may have hallucinated because he said, "I am Jesus."

(AR 296). Plaintiff later denied hallucinating and told hospital staff he said "Jesus" because he felt nauseated. Plaintiff also told hospital staff that he had been drinking all weekend prior to the emergency room visit. Due to Plaintiff's head contusion, a CT scan was performed, but revealed no abnormalities. Plaintiff left the same day against medical advice.

On April 16, 2010, Plaintiff presented at the emergency room hallucinating, hyperventilating, and coughing. Plaintiff was agitated and hospital staff gave him Haldol to calm him. Plaintiff stated that he had been drinking several days previously, and he tested positive for marijuana. Plaintiff was admitted, had neurological and psychiatric consultations, and received psychotropic medications, which improved his mental state to normal behavior. The doctors recommended that Plaintiff follow up with a psychologist for his mental impairments and a specialist for his diabetes.

On April 22, 2010, Plaintiff enrolled as an outpatient at Edgewater Systems for Balanced Living Addiction Services Center ("Edgewater"). The records of enrollment at Edgewater consist of a Statement of Client Rights, a Client Handbook, and five refill prescriptions from June 10, 2010.

On July 1, 2010, Plaintiff saw his primary care physician, David J. Flores M.D., complaining of leg swelling, headache, depression, and back pain. At the visit, Plaintiff informed Dr. Flores that he is bipolar and that he began taking Wellbutrin and Seroquel while in the hospital. Plaintiff also stated that he stopped taking the Seroquel because it made him drowsy and upset his stomach but that he continued to take the Wellbutrin. Dr. Flores told Plaintiff to continue with the Wellbutrin, consult a psychiatrist, and return in a couple weeks.

Plaintiff returned to Dr. Flores' office on July 16, 2010. Prior to this visit, Plaintiff cancelled his appointment to see a psychiatrist but continued taking the Wellbutrin. Other than a complaint

of headaches, Plaintiff's blood levels and mood were well-controlled by medication. Dr. Flores instructed Plaintiff to continue the course of medication.

On June 25, 2011, Plaintiff visited Dr. Flores for his yearly exam. Plaintiff told Dr. Flores that he had not been taking his diabetes or psychotropic medications for two weeks because he ran out of pills. Plaintiff denied headaches, fluctuating blood sugar, or mood swings. However, Plaintiff reported some blurry vision in the left eye. Dr. Flores renewed Plaintiff's prescriptions.

On July 17, 2011, Plaintiff arrived at the emergency room by ambulance after taking an overdose of Wellbutrin, having a seizure, and falling out of bed. During a psychiatric consultation, Plaintiff was unable to tell Dr. Mohammed Butt why he took so many Wellbutrin pills at once. Dr. Butt found the Plaintiff "very guarded" and "presently [ ] gravely disabled, unable to care for self, a danger to self." (AR 575). Dr. Butt assigned Plaintiff a GAF (Global Assessment of Functioning) of 20, diagnosing Plaintiff with major depression, drug overdose, suicide attempt, seizure disorder, and problems with his social environment. After transfer from the ICU to the psychiatric unit, Plaintiff stabilized, exhibited normal behavior, and left the unit without suicidal notions.

On October 15, 2011, Plaintiff had MRIs on both shoulders due to shoulder injuries allegedly sustained from falling during his seizure. The MRI revealed mild tendinitis and arthritic changes, but no tears in the muscle or tendons.

2.     *Consultative Examinations and Reports*

On June 15, 2010, Irena Walters Psy.D. conducted a mental status examination of Plaintiff. Even though Plaintiff had trouble answering questions, he made good eye contact, was oriented, and was cooperative. Plaintiff denied alcohol or drug abuse. Plaintiff demonstrated fair recollection of information and had good insight and judgment skills. Dr. Walters diagnosed Plaintiff with

psychosis (NOS), depressive disorder (NOS), R/O schizoaffective disorder (depressed), alcohol abuse/dependence, marijuana abuse/dependence, and gave Plaintiff a GAF score of 55.

On June 24, 2010, B. Saavedra M.D. examined Plaintiff at the request of the Disability Determination Bureau. Plaintiff told Dr. Saavedra about his prior drug and alcohol abuse, his April 2010 hospitalization, his diabetes, possible neuropathy in his hands and feet, and that he has difficulty walking or standing for any length of time. Dr. Saavedra's report included a Range of Motion Chart, which contained no limitations to Plaintiff's spine and extremities. After the medical and psychological exams, Dr. Saavedra diagnosed Plaintiff with a history of diabetes, bipolar disorder, alcohol and drug abuse, high blood pressure, and arthritic changes to both hands and feet.

On June 30, 2010, J.V. Corcoran, M.D. opined that any physical impairments are not severe and that "review of evidence shows that there is not a credible [medically determinable impairment] for physical origin of alleged mental confusion." (AR 444). On September 30, 2010, M. Ruiz, M.D. reviewed all the evidence in the record and affirmed Dr. Corcoran's opinion.

On July 13, 2010, Kari Kennedy, Psy.D completed a psychiatric review technique form, finding that Plaintiff suffered from depression (NOS) and alcohol and marijuana abuse. Dr. Kennedy considered Plaintiff's impairments under Listings 12.03 Schizophrenic, Paranoid, and Other Psychotic Disorders, 12.04 Affective Disorders, and 12.09 Substance Addiction Disorders, finding a mild degree of limitation in the restriction of activities of daily life, a moderate degree of limitation in difficulties in maintaining social functioning, a moderate degree of limitation in difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. (AR 473).

In addition to the psychiatric review technique form, Dr. Kennedy completed a Mental Residual Functional Capacity Assessment ("MRFC"), finding that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions, his ability to interact appropriately with the general public, and his ability to respond appropriately to changes in the work setting. In the other sixteen areas, Dr. Kennedy found that Plaintiff was "not significantly limited." (AR 445-46). Dr. Kennedy determined that Plaintiff had a medically determinable impairment that could reasonably cause his symptoms, but Plaintiff's description of the intensity and impact of the symptoms upon his functionality was not consistent with the rest of the medical evidence. Dr. Kennedy specifically pointed to Plaintiff's report that he worked in fast food for three to four years and then left for another position because he was paid more and not as a result of his impairments. Additionally, Plaintiff reported that he enrolled in a drug and alcohol treatment facility and stated that his medications alleviated his symptoms; yet he was unable to provide corroborating records. In consideration of the medical evidence and her own observations, Dr. Kennedy found that Plaintiff is able to:

> understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting. [Plaintiff] may prefer to work in a setting where he has minimal interaction with others. [Plaintiff] appears capable of unskilled work.

(AR 448). On September 17, 2010, Joseph A. Pressner, Ph.D. affirmed Dr. Kennedy's assessment.

On June 25, 2011, Dr. Flores completed a Determination of Medicaid Disability–Medical Information form. Dr. Flores recommended that Plaintiff receive a psychiatric evaluation to assess his "agoraphobia characteristics [and] findings [consistent with] bipolar/[general anxiety]/depression." (AR 511, 513). Dr. Flores wrote that Plaintiff's "conditions are usually

lifelong and standard treatment options may not improve function enough for gainful employment."
(AR 513). Dr. Flores received a mental impairment questionnaire, but did not fill it out. However,
on the form is a handwritten notation, dated July 30, 2011, that Dr. Flores told Plaintiff that he
should make an appointment with a psychiatrist.

### C. Plaintiff's Testimony

At the first hearing on July 13, 2011, Plaintiff testified about his impairments, stated that he
last used drugs and alcohol in April 2010, and admitted to missing doses of his medication. When
asked about his daily activities, Plaintiff replied that he wakes up between eight and eleven o'clock
in the morning, sits in his room all day, takes his medication, watches television, and sometimes
takes out the trash. Plaintiff testified that he occasionally communicates with family or friends.
Plaintiff reported that he sometimes has trouble controlling his blood sugar and that the blood sugar
readings are usually high. When asked about any potential limitations in the workplace, Plaintiff
testified that he could comfortably lift forty to fifty pounds, sit for a couple of hours at a time before
taking a break to walk and stretch, and regularly use his hands. Plaintiff also testified that he has not
been receiving long term treatment for schizophrenia. Plaintiff reported that he preivously worked
at McDonald's but quit because "a lot of problems went on." (AR 95).

At the December 7, 2011 supplemental hearing, Plaintiff indicated that he was doing better
than he was during his July 2011 hospitalization, which took place shortly after the first hearing.
Plaintiff stated that he has problems controlling his blood sugar and that he was taking medication
to control it.

### D.  Mother's Testimony

Theresa Acevez, Plaintiff's mother, testified at both the July 13, 2011 and December 7, 2011 hearings. Ms. Acevez reported that Plaintiff does not go outside, watches television, believes people are after him, and believes people laugh at him. Ms. Acevez also reported that Plaintiff helps around the house, takes out the trash, and helps with yard work until he becomes tired.

At the December 7, 2011 hearing, Ms. Acevez commented that Plaintiff's mood and health improved since his July 2011 hospitalization. Ms. Acevez said that Plaintiff has not seen a psychiatrist outside of the hospital, but is arranging to see a psychiatrist from Edgewater sometime in January 2012. Ms. Acevez reported that Plaintiff helps out around the house and interacts with the family but that Plaintiff has dizzy spells, blurry vision, and pain in his shoulders and hands once or twice a week.

### E.  Medical Expert Testimony

James Brooks, Ph.D. testified at the December 7, 2011 hearing as a medical expert. Dr. Brooks noted that, during the April 2010 hospitalization, there was a concern about hallucinations and paranoia in addition to evidence of alcohol abuse and some head trauma. However, there was no conclusive evidence to support a brain syndrome or bipolar disorder and that Plaintiff's mood and health had greatly improved during treatment. Dr. Brooks acknowledged that Plaintiff followed up with Edgewater; however, there is no evidence that he received long-term treatment or a full diagnosis from that facility.

Dr. Brooks testified that it was unclear from the July 2011 hospitalization records whether Plaintiff's Wellbutrin overdose was intentional. Dr. Brooks noted that Plaintiff had a discharge diagnosis of depression but that there was no evidence of paranoia or hallucinations. Dr. Brooks

testified that, although Dr. Walters diagnosed Plaintiff with psychosis because of Plaintiff's feelings of being followed, Dr. Brooks did not see evidence of psychosis because Plaintiff had been drinking heavily and using marijuana prior to the April 2010 visit, which may have contributed to his hallucinations.

Dr. Brooks opined that Plaintiff had a mild impairment in his activities of daily living from a mental impairment perspective and that he also had a mild impairment in his social functioning as well as concentration, memory, and performing tasks. Because of the hospitalizations, Dr. Brooks assessed decompensation as moderate.

Dr. Brooks noted that Plaintiff's drug and alcohol use prior to the April 2010 hospitalization may have affected his impairments and mental status. Dr. Brooks also noted that according to the medical record he could not tell if Plaintiff was still abusing drugs or alcohol, and if Plaintiff was currently abusing drugs or alcohol Plaintiff would be "unreliable in a work setting." (AR 56-57). Barring any drug or alcohol abuse, Dr. Brooks reported that he would place no limitations on Plaintiff's ability to work in simple, routine, and repetitive jobs. Additionally, Dr. Brooks would not place limitations on social functioning, persistence, or pace in a normal work setting.

### F. Vocational Expert's Testimony

At the second hearing on December 7, 2011, the ALJ presented a hypothetical with Plaintiff's RFC to vocational expert Clifford Brady, who testified that the individual could engage in Plaintiff's past work as a fast food worker. The vocational expert further testified that Plaintiff could also perform additional jobs in the national and regional economy of dining service worker, (DOT # 311.472-010), office helper (DOT # 239.567-010), and sales attendant (DOT# 299.677-

010). He testified that the typical allotted time off was approximately six times per year and that if an employee was absent more often, gainful employment might not be possible.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v.*

*Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from

engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

13

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision, arguing that (1) the ALJ's RFC determination did not incorporate all of Plaintiff's impairments and (2) the ALJ's credibility finding is not supported by the medical record .[1] The Court considers each argument in turn.

### A. ALJ's RFC Determination

The RFC determination, at steps four and five of the sequential evaluation, is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §416.945(a); SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The evidence relevant to the RFC determination includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, at *5. The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. In addition, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

---

[1] In the section of Plaintiff's brief titled "Issues for Review," Plaintiff states that the ALJ neglected to consider Plaintiff's "complaints of pain." However, Plaintiff does not allege disability due to pain anywhere else in his brief. The inclusion of this phrase appears to be in error.

*1.      Dr. Kennedy's Opinion*

Plaintiff contests the ALJ's reliance on Dr. Kari Kennedy's opinion. On the Psychiatric Review Technique form, Dr. Kennedy indicated that Plaintiff has moderate limitations in social functioning and in maintaining concentration, persistence, or pace. Similarly, on the MRFC assessment form, Dr. Kennedy found that Plaintiff has moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, and respond appropriately to changes in work setting. Plaintiff argues that the ALJ erred by failing to incorporate these moderate limitations in the RFC.

However, Plaintiff fails to recognize that in the "Functional Capacity Assessment" section of the same MRFC assessment form, Dr. Kennedy went on to opine that, based on the "totality of evidence in the file," Plaintiff "is able to: understand, carry out, and remember simple instructions; able to make judgments commensurate with [the] functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; [and] able to deal with changes in a routine work setting." (AR 480). Thus, the ALJ specifically incorporated the functional limitations opined by Dr. Kennedy by finding that Plaintiff can "understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. He is able to interact appropriately with supervisors and coworkers in a routine setting, and is able to respond to usual work situations and to changes in a routine work setting." AR at 31.[2] By adopting Dr. Kennedy's opinion, the ALJ accounted for Plaintiff's deficiencies in social functioning and

_____

[2] Under SSR 96-8p, the findings related to the paragraph B criteria are "not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." *Id.* The ALJ explained this difference in his decision.

15

concentration, persistence, or pace in crafting the RFC. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002); *see also Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010) (finding that the ALJ adequately accounted for the claimant's limitations in concentration, persistence, and pace by incorporating the expert's assessment that the claimant could perform unskilled work despite her mental limitations); *Wynstra v. Astrue*, 2:11-CV-437, 2013 WL 550491, at *10-11 (N.D. Ind. Feb. 12, 2013); *Williams v. Astrue*, 1:11-CV-390, 2013 WL 228199, at *6-7 (N.D. Ind. Jan. 22, 2013).

2.    *Dr. Brooks' Opinion*

Plaintiff asserts that the ALJ improperly gave great weight to the opinion of Dr. Brooks because three of Dr. Brooks' statements are allegedly not supported by the medical record. Plaintiff identifies Dr. Brooks' opinion that Plaintiff's alcohol and drug abuse affects Plaintiff's work abilities and relationships, that absent the presence of alcohol or drugs Plaintiff would have no limitations in his ability to maintain concentration, persistence, or pace, and that Plaintiff would have no problems interacting with supervisors or the public because there is evidence that "he tends to get along fairly with family, . . . friends and others." (Pl. Br. 9). In support, Plaintiff notes that Dr. Brooks admitted that there was no evidence of drug or alcohol use in the record after April 2010 and that the medical records show alcohol treatment at Edgewater.

Plaintiff's argument fails because the ALJ thoroughly discussed Dr. Brooks' entire opinion, not only the selected statements identified by Plaintiff, and because Dr. Brooks' opinion is in fact supported by the medical evidence of record. First, the ALJ noted that Dr. Brooks opined that the record showed sufficient medical evidence of depression but not enough consistently present symptoms to support a diagnosis of major depression and no convincing evidence to warrant consulting psychologist Dr. Walter's diagnosis of psychosis. The ALJ noted that Dr. Brooks opined

that Plaintiff's drug and alcohol use prior to April 2010 could have contributed to Plaintiff's complaints of hallucinations at that time. In his opinion, Dr. Brooks noted that Plaintiff showed no evidence of delusions, paranoia, or hallucinations at his July 2011 hospitalization, and, contrary to Plaintiff's argument, Dr. Brooks stated that there was nothing in the record indicating whether Plaintiff was abusing drugs or alcohol prior to the July 2011 hospitalization.

The ALJ further noted that Dr. Brooks opined that alcohol was a factor in Plaintiff's treatment history but that absent alcohol abuse, Plaintiff could perform simple, repetitive tasks and had no limitations in concentration, persistence, or pace. Dr. Brooks noted that the record showed that Plaintiff had an average IQ and no evidence of psychosis or a cognitive or memory impairment. Dr. Brooks also opined that Plaintiff had mild limitations in social functioning and cited reports that he tended to get along fairly well with family, friends, and others. Thus, contrary to Plaintiff's argument, Dr. Brooks gave sufficient factual support for his opinions regarding the impact of Plaintiff's alcohol and drug use.

Moreover, Dr. Brooks' opinion is entirely consistent with the medical evidence. First, Plaintiff does not explain how Dr. Brooks' opinion that Plaintiff can perform simple, repetitive tasks is inconsistent with the evidence that Plaintiff underwent inpatient alcohol abuse treatment in April 2010 and then tested negative for illegal substances thereafter. Plaintiff's logic is nonsensical. The fact that Plaintiff received treatment and tested negatively for illegal substances afterwards does not mean that Dr. Brooks' opinions was inconsistent with the medical evidence. Second, in citing *Kingail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006), Plaintiff wrongly suggests that the ALJ found that Plaintiff's alcohol and substance abuse caused or brought about his mental impairments.

In this case, the ALJ detailed Plaintiff's medical history and concluded that the medical history did not support restrictions greater than those that he assigned in the RFC. Neither Dr. Brooks nor the ALJ found that Plaintiff's alcohol and drug abuse caused his mental impairments nor did they attribute all of Plaintiff's symptoms and limitations to his past alcohol and drug abuse. Rather, Dr. Brooks found no convincing evidence to support a diagnosis of psychosis because Plaintiff's heavy alcohol and drug abuse could have contributed to Plaintiff's complaints of hallucinations at his April 2010 hospitalization. Notably, the April 2010 hospitalization is the only time that hallucinations are mentioned, and, even within those treatment notes, Plaintiff appears to deny having had hallucinations. Dr. Brooks correctly noted that there are no other instances of hallucinations noted in the record, including during the July 2011 hospitalization. The ALJ made no independent medical finding as suggested by Plaintiff. Accordingly, the ALJ did not err in the weight given to Dr. Brooks' testimony.

### 3. Dr. Flores

Plaintiff notes that the ALJ did not specifically discuss the "Determination of Medicaid Disability" form that Dr. Flores, Plaintiff's primary care physician, filled out on June 25, 2011. On that form, Dr. Flores wrote that Plaintiff suffers from "agorophobia characteristics" and wrote "findings c/w bipolar/[general anxiety]/depression." (AR 511). Dr. Flores also wrote that Plaintiff's conditions are "usually lifelong and standard treatment options may not improve function enough for gainful employment." (AR 513). However, Dr. Flores did not list any functional limitations and indicated that a psychiatric consultation was necessary to clarify the degree of impairment caused by Plaintiff's mental impairments. Also, when Dr. Flores was provided with a Mental Impairment Questionnaire to fill out on behalf of Plaintiff, Dr. Flores did not complete the form and had a

member of his staff make a notation that Dr. Flores directed Plaintiff to make an appointment with a psychiatrist. To the extent that the failure to mention the form constitutes any harm, it is inconsequential, and the burden is on Plaintiff to show otherwise. *See Parker*, 597 F.3d at 924; *see also Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000). Plaintiff offers no analysis of how Dr. Flores' unsupported, general statement should change the ALJ's RFC. Thus, the ALJ did not commit reversible error by failing to mention Dr. Flores's statements in formulating the RFC.

4.      *Substantial Medical Evidence*

Finally, Plaintiff argues that the medical record does not support the RFC, listing three medical events in support. Plaintiff identifies his April 2010 hospitalization for hallucinations, the April 2010 enrollment form for treatment at Edgewater, and his July 2011 hospitalization for ingesting an overdose of Wellbutrin. No analysis accompanies this list of events to show how they conflict with the RFC. Following Plaintiff's hospitalization in April 2010, the record contains no further instances of hallucinations. Although Plaintiff appears to have enrolled with Edgewater as part of his hospitalization in April 2010, there are no treatment records from Edgewater other than prescription sheets for Haldol and Wellbutrin in June 2010. Finally, the notation by Dr. Mohammad Butt on July 18, 2011, that "the patient presently is gravely disabled, unable to care for self, a danger to self" and that Plaintiff "needs acute psychiatric stabilization," was made in the context of Plaintiff's intake evaluation. The ALJ explicitly considered the GAF of 20 assigned by Dr. Butt but found that Plaintiff had significantly improved during his admission and was discharged in stable condition. Plaintiff has failed to show how these medical records conflict with the RFC.

The Court finds that the ALJ properly relied on the opinions of Dr. Kennedy and Dr. Brooks and did not stray from the medical record in formulating the RFC. Plaintiff has failed to show otherwise.

## B. Credibility

Once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of the symptoms. 20 C.F.R. § 416.929(a). The ALJ must consider a claimant's statements about symptoms and how the claimant's symptoms affect his daily life and ability to work. *Id.* Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* When determining disability, the ALJ must weigh these subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)      The individual's daily activities;
(2)      Location, duration, frequency, and intensity of pain or other symptoms;
(3)      Precipitating and aggravating factors;
(4)      Type, dosage, effectiveness, and side effects of any medication;
(5)      Treatment, other than medication, for relief of pain or other symptoms;
(6)      Other measures taken to relieve pain or other symptoms;
(7)      Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3). When evaluating the record as a whole, the ALJ considers any information provided by treating or examining physicians and other persons about the factors and how they affect the claimant. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* § 416.929(c)(1). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific

reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

In this case, the ALJ fully discussed all the factors in determining Plaintiff's credibility. The ALJ discussed Plaintiff's subjective statements, including his, his sister's, and his mother's statements as to the severity of his symptoms and their effects on his functioning. The ALJ considered Plaintiff's treatment history for both his physical and mental impairments, including his successful treatment for alcohol abuse, and discussed Plaintiff's medications and the lack of any reported side effects. The ALJ analyzed the objective medical evidence, including the examination findings and opinions of the record medical sources, and discussed the evidence regarding Plaintiff's activities of daily living. Nevertheless, Plaintiff argues that the ALJ did not properly consider his medical history and his activities of daily living.

*1.    Medical History*

Plaintiff first contends that the ALJ did not properly consider whether his testimony was supported by the findings in the medical record regarding the intensity, persistence, and limiting effects of his impairments. Plaintiff is incorrect. To support his finding that Plaintiff is not as limited as he claims, the ALJ conducted a detailed review of the objective medical evidence, including Plaintiff's mental health treatment. As set forth above, the ALJ discussed Plaintiff's mental impairments during the April 2010 and July 2011 hospitalizations, noting that when Plaintiff received mental health care, his symptoms improved markedly.

Although Plaintiff contends that he was receiving treatment at Edgewater in 2010 for his mental impairments, the ALJ correctly notes that "it is unclear whether the claimant underwent any treatment, as the notes primarily consist of brochures containing the types of treatment available at

Edgewater." (AR 32). The mere fact that an Edgewater doctor prescribed medication after Plaintiff's inpatient stay does not demonstrate that the ALJ erred in considering Plaintiff's treatment at Edgewater. Indeed, when Plaintiff saw Dr. Flores in July 2010, he had not seen a psychiatrist. Because Plaintiff had the opportunity to receive continued mental health care and did not, the ALJ determined that Plaintiff's claims about the intensity, persistence, and limiting effects of his impairments were not credible. While Plaintiff suggests that his "medical records document on-going struggles to control his mental health conditions and several episodes of decompensation," (Pl. Br. 12), he does not explain how any of the medical records show limitations greater than those credited by the ALJ.

Again, the ALJ properly relied on Dr. Kennedy's opinion that Plaintiff could perform simple tasks and instructions if taking the proper medication and receiving the right care. The medical record and Dr. Kennedy's assessment support the ALJ's finding that Plaintiff is not as limited as he contends. In this section, Plaintiff again repeats Dr. Flores' statements on the Determination of Medicaid Disability form and again offers no analysis of how Dr. Flores' unsupported, general statement should change the ALJ's credibility determination.

The ALJ properly considered the medical evidence of record in determining Plaintiff's credibility.

2.      *Activities of Daily Living*

Plaintiff argues that the ALJ overstated Plaintiff's ability to perform various activities of daily living in discrediting his testimony. In his decision, the ALJ noted that Plaintiff "indicated that he enjoys watching and playing sports, has a supportive family, and enjoys playing with his nieces and nephews." (AR 32-33). Additionally, he noted that Dr. Walters found that Plaintiff could "bathe,

groom, and dress himself, take out the trash and do dishes, and do yard work." (AR 33). An ALJ must consider the difference between a plaintiff's ability to do occasional household activities and the ability to work full time. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *see also Clifford*, 227 F.3d at 872; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1998). In this case, the ALJ does not rely solely on Plaintiff's daily activities, but rather properly considers them along with the other listed factors in determining Plaintiff's credibility.

3.      *Impact of Medication*

In his decision, the ALJ noted that "[r]ecords indicate the claimant was noncompliant several times with his medication." (AR 32). Plaintiff argues that the ALJ erred by relying on this fact to discredit Plaintiff without investigating Plaintiff's reasons for his non-compliance. *See Shauger*, 675 F.3d at 696 (noting that gaps in treatment history or a failure to adhere to a treatment plan can negatively impact a plaintiff's credibility and that an ALJ must consider the reasons for plaintiff's non-compliance); *see also Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) (clarifying that the ALJ can rely on non-compliance, but must first consider plaintiff's explanations for non-compliance.); SSR 96-7p.

Plaintiff's argument is misplaced. A careful reading of the decision reveals that the ALJ did not find Plaintiff less credible because he occasionally failed to take his medication. Rather, the ALJ made this comment in the context of discussing the effectiveness of Plaintiff's medication in treating his symptoms without side effects. *See* (AR 32) ("[H]e stabilized with the use of medications and cessation of alcohol and exhibited normal behavior at discharge."). For example, the ALJ cited instances in July 2010 and June 2011 in which Plaintiff's reports of increased symptoms were

preceded by his failure to take his medications. *See id.* Nor did the ALJ find, as insinuated by Plaintiff, that Plaintiff's symptoms resolved during the times he did not take his medication or receive regular mental health treatment.

Because the ALJ properly weighed and considered the medical record, use of daily activities, and the effects of medication to determine the validity of Plaintiff's claims of intensity, persistence, and pace, the Court finds that the ALJ's credibility determination was not "patently wrong." *See Shideler*, 688 F.3d at 310-11; *Prochaska*, 454 F.3d at 738.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief sought in Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 16], and **AFFIRMS** the Commissioner of Social Security's final decision.

SO ORDERED this 31st day of July, 2014.


s/ Paul R. Cherry              
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record